## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**THOMAS E.,**[1]

      **Plaintiff,**

          **v.**

**MARTIN O'MALLEY,**
**Commissioner of Social Security,**

      **Defendant.**

                              **Case No. 2:22-cv-2514**
                              **Magistrate Judge Norah McCann King**

## OPINION AND ORDER

This matter comes before the Court pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), regarding the application of Plaintiff Thomas E. for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* Plaintiff appeals from the final decision of the Commissioner of Social Security denying that application.[2] After careful consideration of the entire record, including the entire administrative record, the Court decides this matter pursuant to Rule 78(b) of the Federal Rules of Civil Procedure. For the reasons that follow, the Court affirms the Commissioner's decision.

## I.    PROCEDURAL HISTORY

On June 24, 2014, Plaintiff filed his application for benefits, alleging that he has been disabled since November 1, 1998. R. 106, 112, 211–19. The application was denied initially and upon reconsideration. R. 120–24, 128–30. Plaintiff sought a *de novo* hearing before an

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to plaintiffs in such cases by only their first names and last initials. *See also* D.N.J. Standing Order 2021-10.

[2] Martin J. O'Malley, the current Commissioner of Social Security, is substituted as Defendant in his official capacity.

administrative law judge ("ALJ"). R. 131–132. ALJ Peter Lee held hearings on December 28, 2016, and March 31, 2017, at which Plaintiff, who was represented by counsel, appeared and testified, and at which a vocational expert testified at the latter hearing. R. 52–105. In a decision dated May 3, 2017, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act from November 1, 1998, Plaintiff's alleged disability onset date, through December 31, 2003, the date on which Plaintiff was last insured. R. 40–47 ("the 2017 decision"). On Plaintiff's appeal from that decision, this Court granted the parties' Consent Order to Remand Pursuant to Sentence Four of 42 U.S.C. § 405(g), directing as follows:

> Upon remand, the Appeals Council will direct the administrative law judge to re-evaluate the medical source opinion of May Ann Picone, M.D., and further evaluate Plaintiff's residual functional capacity. The administrat[ive] law judge will also obtain evidence from a medical expert regarding the severity and limiting effects of Plaintiff's relapse-remitting multiple sclerosis (RRMS) during the period at issue. Plaintiff will be offered the opportunity for a hearing and a new decision will be issued.

R. 855–56.

On September 17, 2019, the Appeals Council remanded the matter for resolution of the following issues:

- The Administrative Law Judge's evaluation of the treating opinion of Dr. Picone was not sufficient. In a January 20, 2017 letter, Dr. Picone stated the claimant has been a patient of the MS (multiple sclerosis) Center at Holy Name Medical Center since August 11, 1997 (Exhibit 7F, page 2). Dr. Picone further stated the claimant has relapsing secondary progressive MS and has been disabled due to lower extremity weakness, particularly left leg weakness, pain, numbness, fatigue and balance deficits since 1997 (Id.). The Administrative Law Judge gave "little weight to the medical opinion of Dr. Picone . . . because not only is it an opinion reserved for the Commissioner but it is also contrary to contemporaneous notes in 2003 which state that the claimant had RRMS [relapse remitting multiple sclerosis] and that the claimant was in remission during the time period" (Decision, page 6). However, medical records indicate the claimant's RRMS was not in remission in 2003. In January 2003, the claimant received treatment for symptoms related to MS which was diagnosed as active by MRI and clinically (Exhibit 1F, page 12). In April 2003, the claimant

received five days of IV steroids due to MS (Exhibit 1F, pages 20-21) and still had left side weakness in May 2003 (Exhibit 1F, page 21). In October 2003, the claimant had an exacerbation of his MS symptoms and was prescribed a three-day treatment of IV steroids (Exhibit 1F, pages 28-30).

- The Administrative Law Judge did not sufficiently explain the basis of the residual functional capacity finding. The Administrative Law Judge stated he made this determination "having reviewed all the medical evidence available and after hearing the claimant's testimony" (Decision, page 6). However, the Administrative Law Judge did not explain the specific medical evidence and testimony that supported the residual functional capacity finding. The Administrative Law Judge also gave little weight to the only medical opinions in the file so the residual functional capacity was not based on any medical opinion, but instead the Administrative Law Judge's interpretation of the record (Decision, page 6).

R. 858, 860. The Appeals Council further directed that, upon remand, the ALJ was to:

- Give further consideration to the treating source opinion of Dr. Picone pursuant to the provisions of 20 CFR 404.1527, and explain the weight given to such opinion evidence. As appropriate, the Administrative Law Judge may request the treating source provide additional evidence and/or further clarification of the opinion (20 CFR 404.1520b).
- Obtain evidence from a medical expert related to the nature and severity of and functional limitations resulting from the claimant's RRMS (20 CFR 404.1513a(b)(2)).
- Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations (20 CFR 404.1545 and Social Security Ruling 96-8p).

In compliance with the above, the Administrative Law Judge will offer the claimant the opportunity for a hearing, take any further action needed to complete the administrative record and issue a new decision.

R. 860.

On July 13, 2021, a different ALJ, Dina Loewy, held a hearing at which Plaintiff, who was represented by counsel, testified as did Steven Goldstein, M.D., who testified as a medical expert. R. 794–825. ALJ Loewy held a second administrative hearing on November 16, 2021, during which Plaintiff was again represented by counsel and during which Plaintiff's wife and a vocational expert testified. R. 760–93. In a decision dated March 2, 2022, the ALJ concluded that

Plaintiff was not disabled within the meaning of the Social Security Act at any time from November 1, 1998, Plaintiff's alleged disability onset date, through December 31, 2003, the date on which Plaintiff was last insured for benefits. R. 735–51 ("the 2022 decision"). Plaintiff timely filed this appeal from that decision, *see* 20 C.F.R. § 404.984(d), pursuant to 42 U.S.C. § 405(g). ECF No. 1. On June 21, 2022, Plaintiff consented to disposition of the matter by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. ECF No. 5.[3] On June 22, 2022, the case was reassigned to the undersigned. ECF No. 6. The matter is ripe for disposition.

## II.     LEGAL STANDARD

### A.     Standard of Review

In reviewing applications for Social Security disability benefits, this Court has the authority to conduct a plenary review of legal issues decided by the ALJ. *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  In contrast, the Court reviews the ALJ's factual findings to determine if they are supported by substantial evidence. *Sykes v. Apel*, 228 F.3d 259, 262 (3d Cir. 2000); *see also* 42 U.S.C. §§ 405(g). The United States Supreme Court has explained this standard as follows:

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations. And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is more than a mere scintilla. It means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal citations and quotation marks

---

[3]The Commissioner has provided general consent to Magistrate Judge jurisdiction in cases seeking review of the Commissioner's decision. *See* Standing Order In re: Social Security Pilot Project (D.N.J. Apr. 2, 2018).

omitted); *see also Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal

quotations omitted); *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009)

(citations and quotations omitted); *K.K. ex rel. K.S. v. Comm'r of Soc. Sec.*, No. 17-2309, 2018

WL 1509091, at *4 (D.N.J. Mar. 27, 2018).

The substantial evidence standard is a deferential standard, and the ALJ's decision cannot

be set aside merely because the Court "acting de novo might have reached a different

conclusion." *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986); *see*, *e.g.*, *Fargnoli*

*v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported

by substantial evidence, we are bound by those findings, even if we would have decided the

factual inquiry differently.") (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *K.K.*,

2018 WL 1509091, at *4 ("'[T]he district court ... is [not] empowered to weigh the evidence or

substitute its conclusions for those of the fact-finder.'") (quoting *Williams v. Sullivan*, 970 F.2d

1178, 1182 (3d Cir. 1992)).

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic

or self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)

("The search for substantial evidence is thus a qualitative exercise without which our review of

social security disability cases ceases to be merely deferential and becomes instead a sham.");

*see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484, 2016 WL 4212102, at *3 (D.N.J. Aug. 9,

2016). The Court has a duty to "review the evidence in its totality" and "take into account

whatever in the record fairly detracts from its weight." *K.K.*, 2018 WL 1509091, at *4 (quoting

*Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citations and quotations omitted));

*see Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) (stating that substantial evidence exists

only "in relationship to all the other evidence in the record"). Evidence is not substantial if "it is

overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114); *see K.K.*, 2018 WL 1509091, at *4. The ALJ's decision thus must be set aside if it "did not take into account the entire record or failed to resolve an evidentiary conflict." *Schonewolf*, 972 F. Supp. at 284-85 (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)).

Although an ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the decision must contain "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000)); *see K.K.*, 2018 WL 1509091, at *4. The Court "need[s] from the ALJ not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected." *Cotter*, 642 F.2d at 705-06; *see Burnett*, 220 F.3d at 121 ("Although the ALJ may weigh the credibility of the evidence, [s/]he must give some indication of the evidence which [s/]he rejects and [the] reason(s) for discounting such evidence.") (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d. Cir. 1999)). "[T]he ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice." *Cotter v. Harris*, 650 F.2d 481, 482 (3d Cir. 1981). Absent such articulation, the Court "cannot tell if significant probative evidence was not credited or simply ignored." *Id.* at 705. As the Third Circuit explains:

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the weight [s/]he has given to obviously probative exhibits, to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Gober*, 574 F.2d at 776; *see Schonewolf*, 972 F. Supp. at 284-85.

Following review of the entire record on appeal from a denial of benefits, the Court can

enter "a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or

without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand is appropriate if the

record is incomplete or if the ALJ's decision lacks adequate reasoning or contains illogical or

contradictory findings. *See Burnett*, 220 F.3d at 119-20; *Podedworny v. Harris*, 745 F.2d 210,

221-22 (3d Cir. 1984). Remand is also appropriate if the ALJ's findings are not the product of a

complete review which "explicitly weigh[s] all relevant, probative and available evidence" in the

record. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted); *see*

*A.B. on Behalf of Y.F. v. Colvin*, 166 F. Supp.3d 512, 518 (D.N.J. 2016).

## B.      Sequential Evaluation Process

The Social Security Act establishes a five-step sequential evaluation process for

determining whether a plaintiff is disabled within the meaning of the statute. 20 C.F.R. §

404.1520(a)(4). "The claimant bears the burden of proof at steps one through four, and the

Commissioner bears the burden of proof at step five." *Smith v. Comm'r of Soc. Sec.*, 631 F.3d

632, 634 (3d Cir. 2010) (citing *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007)).

At step one, the ALJ determines whether the plaintiff is currently engaged in substantial

gainful activity. 20 C.F.R. § 404.1520(b).  If so, then the inquiry ends because the plaintiff is not

disabled.

At step two, the ALJ decides whether the plaintiff has a "severe impairment" or

combination of impairments that "significantly limits [the plaintiff's] physical or mental ability

to do basic work activities[.]" 20 C.F.R. § 404.1520(c). If the plaintiff does not have a severe

impairment or combination of impairments, then the inquiry ends because the plaintiff is not disabled.  Otherwise, the ALJ proceeds to step three.

At step three, the ALJ decides whether the plaintiff's impairment or combination of impairments "meets" or "medically equals" the severity of an impairment in the Listing of Impairments ("Listing") found at 20 C.F.R. § 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(d). If so, then the plaintiff is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least 12 months. *Id*. at § 404.1509. Otherwise, the ALJ proceeds to step four.

At step four, the ALJ must determine the plaintiff's residual functional capacity ("RFC") and determine whether the plaintiff can perform past relevant work. 20 C.F.R. § 404.1520(e), (f). If the plaintiff can perform past relevant work, then the inquiry ends because the plaintiff is not disabled. Otherwise, the ALJ proceeds to the final step.

At step five, the ALJ must decide whether the plaintiff, considering the plaintiff's RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy. 20 C.F.R. § 404.1520(g). If the ALJ determines that the plaintiff can do so, then the plaintiff is not disabled. Otherwise, the plaintiff is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.

## III.   THE 2022 DECISION AND APPELLATE ISSUES

Plaintiff was 40 years old on December 31, 2003, *i.e.,* the date on which he was last insured for disability insurance benefits. R. 738, 749. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity between November 1, 1998, his alleged disability onset date, and that date. R. 738.

8

At step two, the ALJ found that Plaintiff's multiple sclerosis and affective disorder were severe impairments. *Id*.

At step three, the ALJ found that Plaintiff did not suffer an impairment or combination of impairments that met or medically equaled the severity of any Listing. R. 738–40.

At step four, the ALJ found that Plaintiff had the RFC to perform sedentary work subject to various additional limitations. R. 740–49. The ALJ also found that this RFC did not permit the performance of Plaintiff's past relevant work as a draftsman. R. 749.

At step five and relying on the testimony of the vocational expert, the ALJ found that a significant number of jobs—*e.g*., jobs as a call-out operator, a document preparer, a stuffer, and a ticket counter–existed in the national economy and could be performed by Plaintiff despite his lessened capacity. R. 750–51. The ALJ therefore concluded that Plaintiff was not disabled within the meaning of the Social Security Act from November 1, 1998, his alleged disability onset date, through December 31, 2003, the date on which he was last insured. R. 751.

Plaintiff disagrees with the ALJ's findings at steps four and five and asks that the decision of the Commissioner be reversed and remanded with directions for the granting of benefits or, alternatively, for further proceedings. *Plaintiff's Brief,* ECF No. 16; *Plaintiff's Reply Brief*, ECF No. 18. The Commissioner takes the position that his decision should be affirmed in its entirety because the ALJ's decision correctly applied the governing legal standards, reflected consideration of the entire record, and was supported by sufficient explanation and substantial evidence. *Defendant's Brief Pursuant to Local Civil Rule 9.1*, ECF No. 17.

## IV.      SUMMARY OF RELEVANT MEDICAL EVIDENCE

### A.      Terence McHale, P.T.

On March 11, 2020, Terence McHale, a physical therapist, evaluated Plaintiff and

completed a Physical Work Performance Evaluation. R. 2046–54 ("PWPE"). Mr. McHale found

that Plaintiff "participated fully in all tasks. No self-limiting behavior noted." R. 2046. Mr.

McHale concluded that Plaintiff

> [c]annot perform the full range of Sedentary work as defined by the US Dept. of
> Labor in the DOT [Dictionary of Occupational Titles]. This is due to difficulties
> performing the dynamic strength demands of work. The client has difficulty
> performing even Sedentary level work due to limitations with Lifting to Waist,
> Lifting to Eye Level, Bilateral Carrying, Unilateral Carrying, Pushing, and Pulling
> tasks.

*Id*. In support of this conclusion, Mr. McHale found, *inter alia*, that Plaintiff was unable to lift

items from the floor to waist level or from waist to eye level; was unable to carry, pull, work

while kneeling/squatting/crouching; and was unable to crawl, climb a ladder, perform repetitive

trunk rotation-standing, or balance on a ladder. R. 2049. His grip strength was measured as 35

pounds on the left and 37 pounds on the right. *Id*. Mr. McHale identified the following as major

areas of dysfunction: dynamic strength, mobility, manual dexterity, balance, and coordination. R.

2050. According to Mr. McHale, decreased muscle strength in Plaintiff's trunk and upper and

lower extremities, decreased range of motion in Plaintiff's shoulders and left ankle, and

generalized fatigue were factors underlying Plaintiff's performance. *Id*.

### B.    Mary Ann Picone, M.D.

Mary Ann Picone, M.D., Plaintiff's treating physician, provided several opinions, which

are detailed in turn.

### 1.    Opinion dated January 20, 2017

In a January 20, 2017, letter addressed to Plaintiff's former counsel,[4] Dr. Picone stated:

> I am writing this letter to you in regard to the evaluation and treatment of
> Mr. Thomas [E.]. He has been a patient at the MS Center at Holy Name Medical

---

[4] The letter was addressed to Plaintiff's former counsel, Robert Wertalik, Esq. R. 683. Plaintiff is
currently represented by Sheryl Gandel Mazur, Esq.

Center since August 11, 1997. He had begun having symptoms related to Multiple Sclerosis dating back to 1996. During that year he had been having symptoms of dizziness, fatigue, weakness in his legs (transverse myelitis) and thoracic level pain. He had two exacerbations within the year 1996 consisting of weakness in his legs and dizziness which required the use of intravenous corticosteroids to resolve. From the onset of his disease[,] fatigue was a primary symptom. He had originally been treated at New York Hospital and had diagnostic MRI and lumbar puncture done there in 1996. He again had relapse involving severe dizziness in the winter of 1997. In August 1997 at the time of his first visit at the MS Center, Thomas had already been noted to have significant spasticity and weakness in both legs which slowed his gait and made walking difficult. He also had tremor in his left hand. Balance problems were evident and with heat he had increased difficulty walking. He had numbness in his legs. He was started on interferon beta therapy but then was switched to copaxone because of flu like symptoms from the interferon therapy. He continued to have relapses approximately every six months. In 2002 he was switched to Avonex disease modifying therapy. He was also experiencing urinary urgency and frequency prior to 2003. Sexual dysfunction was also an issue. He continued to show progression of his disease activity from 1996 to 2003 despite the use of several disease modifying therapies. Walking[,] in particular, continued to be more labored, slower, and he exhibited increase in stiffness and balance. ln 2003 he had relapse involving slurred speech and difficulty swallowing and left sided numbness and weakness. With each relapse he was treated with intravenous steroids which would help improve symptoms but they never completely resolved. Fatigue and depression were also significant.

In March 2003 Thomas was having increased weakness in his left leg, it would often give out on him when he was walking. He often fell and had a spastic, stiff, gait. Since 2003 Thomas' main deficits have continued to be his spastic gait with left leg weakness, fatigue, numbness in his legs, urinary urgency and frequency, pain[,] intermittent slurred speech and depression. MRI scans have shown extensive bilateral white matter demyelinating lesions with areas of active inflammation. The plan for his MS therapy in view of his continued disease worsening is to start Thomas on the B cell monoclonal therapy Rituxan. The hope with this therapy is to prevent further disease worsening.

In summary Thomas has relapsing secondary progressive MS. *He has been disabled due to his lower extremity weakness, particularly left leg weakness, pain, numbness, fatigue and balance deficits since 1997.* It has been since this time that he has had slowing of his gait and persistent weakness and stiffness. He has never had resolution of his symptoms despite multiple courses of intravenous steroids and various disease modifying therapies. He has continued to worsen throughout the years. *Because of the unremitting nature of his symptoms and his debilitating fatigue, he has not been able to work on any regular basis since 1997. The recent functional capacity work evaluation that was performed also demonstrated his lack of ability to sustain any prolonged activity.*

11

R. 683–84 (emphasis added) ("2017 opinion").

### 2.        Step three opinion dated June 24, 2021

On June 24, 2021, Dr. Picone completed a three-page, check-the-box and fill-in-the-blank form addressing neurological disorders under Listing 11.00. R. 2060–62 ("2021 step three opinion"). Dr. Picone checked the box marked "11.09 Multiple Sclerosis" as well as boxes indicating that Plaintiff had "A. Disorganization of motor function as described in 11.04B[;]" "B. Visual or mental impairment as described under the criteria in 2.02, 2.03, 2.04, or 12.02[;]" and "C. Significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process." R. 2061. Dr. Picone also checked the box marked "11.14 Peripheral neuropathies. With disorganization of motor function as described in 11.04B, in spite of treatment." R. 2062. According to Dr. Picone, the onset date of these conditions was November 1996. *Id*. (noting further that Plaintiff had been "treated at NY Hospital with intravenous solumedrol (steroid)").

### 3.        RFC opinion dated June 24, 2021

On June 24, 2021, Dr. Picone also completed a five-page, check-the-box and fill-in-the-blank form entitled "Residual Functional Capacity Questionnaire." R. 2041–45 ("2021 RFC opinion"). Dr. Picone indicated that the information provided in the questionnaire pertained to treatment from 2002 to the date of the document. R. 2041. Dr. Picone also indicated that she saw Plaintiff quarterly (every three months), "indefinitely[.]" *Id*. She diagnosed "G35" multiple sclerosis, explaining that this diagnosis was based on clinical presentation and MRI lesions consistent with MS. *Id*. Plaintiff's prognosis was guarded. *Id*. Dr. Picone identified Plaintiff's

12

symptoms as follows: fatigue, balance problems, poor coordination, weakness, unstable walking,

numbness or tingling, bladder problems, sensitivity to heat, pain, depression, and double or

blurred vision/partial or complete blindness. *Id*. According to Dr. Picone, Plaintiff had significant

and persistent disorganization of motor function in two extremities resulting in sustained

disturbance of gross and dextrous movement or gait and station, pointing to left-sided

"weakness, weakened hand grasps, severe [left] leg weakness." R. 2042. Plaintiff also suffered

from "significant reproducible fatigue of motor function with substantial muscle weakness on

repetitive activity, demonstrated on physical examination, resulting from neurological

dysfunction in areas of central nervous system known to be pathologically involved by the

multiple sclerosis process." *Id*. Impacted were Plaintiff's ability to engage in "prolonged

standing, prolonged holding of items, walking for any distance greater than 100 ft." *Id*. Dr.

Picone stated that Plaintiff's fatigue was best described as "lassitude" rather than fatigue of

motor function, that emotional factors contributed to the severity of Plaintiff's symptoms and

functional limitations, and that Plaintiff's impairments (physical and any emotional impairments)

were reasonably consistent with the symptoms and functional limitations described in the

evaluation. R. 2042–43. In Dr. Picone's opinion, Plaintiff's experience of fatigue or other

symptoms was severe enough to constantly interfere with attention and concentration. R. 2043.

According to Dr. Picone, Plaintiff had a severe limitation in tolerating work stress. *Id*. Dr. Picone

indicated that Plaintiff's impairments lasted or could be expected to last at least twelve months.

*Id*. Asked to specify the onset date of Plaintiff's symptoms and limitations, Dr. Picone responded

"lifetime[.]" *Id*. Dr. Picone opined that Plaintiff could walk one city block without rest. *Id*. Asked

to estimate other functional limitations in a competitive work situation, including how long

Plaintiff could continuously sit and stand at one time; how long he could sit and stand/walk

13

totally in an eight-hour working day; whether Plaintiff needed a job that permitted changing positions at will from sitting, standing, or walking; whether Plaintiff sometimes needed to take unscheduled breaks; whether Plaintiff's legs should be elevated with prolonged sitting; whether Plaintiff needed a cane or other assistive device when engaging in occasional standing/walking; how many pounds Plaintiff could lift and carry; whether Plaintiff had significant limitations in performing repetitive reaching, handling, or fingering; the percentage of time during an eight-hour workday that Plaintiff could use hands/fingers/arms; the percentage of time that Plaintiff could bend and twist at the waist; and whether Plaintiff had any environmental limitations, Dr. Picone referred to Mr. McHale's evaluation. R. 2043–45. According to Dr. Picone, Plaintiff's impairments were likely to produce "good days" and "bad days" and Plaintiff "is totally disabled[.]" R. 2045.

### 4.   Opinion dated June 25, 2021

Finally, in a letter dated June 25, 2021, and addressed to "To Whom It May Concern[,]" Dr. Picone stated and opined as follows:

> Thomas E[.] has been a patient of the MS center since 2002. He has been disabled since that time secondary to his diagnosis of the progressive disease Multiple Sclerosis. Below are the series of events that led to this determination:
>
> July 2002-These are when Thomas's initial problem began. He complained of slurred speech, dysphagia, left side numbness including his face, left hemiparesis. He was given 3 days of intravenous steroids without full recovery.
>
> January 2003-Left side of his body is numb, left side facial weakness, urinary urgency and frequency, erectile dysfunction, unsteady gait.
>
> March 2003-His left leg began to "give out" multiple falls, he was limping at this time, left hand weakness dropping things often with weakened hand grasps.
>
> May 2003-IV steroids given for symptoms without complete resolution.
>
> June 2003-October 2003-mouth and lips numb, slurred speech, double vision, vision loss, multiple falls, dragging left leg.

14

With time these symptoms have only gotten worse, I have been medically managing Thomas's MS for many years and have witnessed his struggles with this debilitating disease. Based on my professional opinion and expertise in Multiple Sclerosis, Thomas is fully disabled and unable to perform any work duties. Please grant him permanent disability.

R. 2057 ("2021 letter opinion").

C.     Steven Goldstein, M.D.

Steven Goldstein, M.D., a Board-certified internist and neurologist, testified as a medical expert during the July 13, 2021, administrative hearing. R. 794–824.[5] Addressing acute attacks related to multiple sclerosis and medication used in treating the condition, Dr. Goldstein testified as follows:

A The purpose of the treatment is to prevent attacks. So even if a normal exam –

Q [by ALJ] Oh, I see.

A -- you really want to continue the treatment to try to prevent more attacks. If you're sure of the diagnosis, let's say somebody is having an acute attack or two acute attacks and we cover that completely—

Q Right.

A --but you can see from the MRI and you can see it from the spinal tap results, the chemical results on the spinal fluid that this clearly is multiple sclerosis, you would treat that patient with a disease-modifying agent to try to prevent further attacks in the future. It doesn't mean that the person is really sick. They may be perfectly fine.

Q And then is the steroids one of the modalities that's used for treatment?

A Well, that's used acutely if somebody gets an acute attack, we'll use steroids. It's not used chronically for multiple sclerosis.

Q I see here that in April [2003], he had five days of steroids and then in October, he was prescribed three days of steroids. So what would that say to you?

A It would suggest that he had an acute attack at both of those times.

_____

[5] The Court further details Dr. Goldstein's testimony later in this decision.

Q Okay. Now, what you're saying is that, if I understood you correctly, what you stated is that someone can have an acute attack and 75 percent of the time, they then go back to baseline, but 25 percent of the time, they don't and that can add up. That's what you're saying.

A It will add up as you get more attacks. That's correct.

Q Okay. So you're stating that you're not able to suggest any types of functional limitations prior to end of December 2003. You're not able to opine regarding any limitations because you don't have the examinations to support your opinion. Is that what you're saying?

A Right. So even if you had an exam during an acute attack, that wouldn't tell you what things would be like six months later or nine months later. You have to have a series of notes of the time to see whether that went away or did not go away.

R. 805–06.

Dr. Goldstein initially testified that, because he did not see in the record a detailed physical examination prior to December 2003, he could not conclude that Plaintiff had a medical impairment that met or equaled a listed impairment or that Plaintiff had any functional limitations. R. 802–03, 806, 808. However, after Dr. Goldstein was alerted to records of physical examinations during the relevant period, he then testified that, in his opinion, Plaintiff would be limited to sedentary work and could push and pull 10 pounds frequently and 20 pounds occasionally in a seated position. R. 808–10.

When asked about Plaintiff's fatigue, Dr. Goldstein testified as follows:

We do know that people exposed to heat will tend to bring out symptoms more. Being more in the cold is usually better for someone with multiple sclerosis. They function better, but I didn't see anything in the record quantitating the degree of fatigue in which he was having and whether that would keep him from functioning or not.

R. 820; *see also* R. 821 (testifying that "[w]hat I see here basically is qualitative statements, and what I see in the record were statements showing weakness going from five out of five. That's completely normal" and stating that "the 25-foot walk going from seven seconds to six seconds,

16

showing improvement that occurred in time, and here it says the walking is more labored, slower, and increased stiffness and balance," and that "we can see pretty clearly that with the 25-foot walk that it quantitates the improvement in the situation. Not the worsening of the situation.").

## V.     DISCUSSION

### A.     Opinion Evidence

Plaintiff challenges the ALJ's consideration of the opinions of Dr. Picone and Dr. Goldberg in finding that Plaintiff had the RFC for a limited range of sedentary work. *Plaintiff's Brief*, ECF No. 16, pp. 22–34; *Plaintiff's Reply Brief*, ECF No. 18, pp. 1–5. For the reasons that follow, this Court disagrees.

An ALJ must evaluate all record evidence in making a disability determination. *Plummer,* 186 F.3d at 433; *Cotter,* 642 F.2d at 704. The ALJ's decision must include "a clear and satisfactory explication of the basis on which it rests" sufficient to enable a reviewing court "to perform its statutory function of judicial review." *Cotter*, 642 F.2d at 704–05. Specifically, the ALJ must discuss the evidence that supports the decision, the evidence that the ALJ rejected, and explain why the ALJ accepted some evidence but rejected other evidence.  *Id*. at 705–06; *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 505–06 (3d Cir. 2009); *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001) ("Although we do not expect the ALJ to make reference to every relevant treatment note in a case . . . we do expect the ALJ, as the factfinder, to consider and evaluate the medical evidence in the record consistent with his responsibilities under the regulations and case law."). Without this explanation, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter*, 642 F.2d at 705; *see also Burnett,* 220 F.3d at 121 (citing *Cotter*, 642 F.2d at 705).

For claims filed before March 27, 2017,[6] "'[a] cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Nazario v. Comm'r Soc. Sec.*, 794 F. App'x 204, 209 (3d Cir. 2019) (quoting *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)); *see also Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 355 (3d Cir. 2008) (stating that an ALJ should give treating physicians' opinions "great weight") (citations omitted); *Fargnoli*, 247 F.3d at 43 (3d Cir. 2001) (stating that a treating physician's opinions "are entitled to substantial and at times even controlling weight") (citations omitted). However, "[a] treating source's opinion is not entitled to controlling weight if it is 'inconsistent with the other substantial evidence in [the] case record.'" *Hubert v. Comm'r Soc. Sec.*, 746 F. App'x 151, 153 (3d Cir. 2018) (quoting 20 C.F.R. § 404.1527(c)(2)); *see also Brunson v. Comm'r of Soc. Sec.*, 704 F. App'x 56, 59–60 (3d Cir. 2017) ("[A]n ALJ may reject the opinion of a treating physician when it is unsupported and inconsistent with the other evidence in the record."). "In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (internal quotation marks and citations omitted). The ALJ must consider the following factors when deciding what weight to accord the opinion of a treating physician: (1) the length of the treatment relationship and frequency of examination; (2) the

---

[6] As previously noted, Plaintiff's claim was filed on June 24, 2014. For claims filed after March 27, 2017, the Commissioner's regulations eliminated the hierarchy of medical source opinions that gave preference to treating sources. *Compare* 20 C.F.R. § 404.1527 *with* 20 C.F.R. § 404.1520c(a).

18

nature and extent of the treatment relationship; (3) the supportability of the opinion; (4) the

consistency of the opinion with the record as a whole; (5) the treating source's specialization;

and (6) any other relevant factors. 20 C.F.R. § 404.1527(c)(1)–(6). Accordingly, "the ALJ still

may choose whom to credit but 'cannot reject evidence for no reason or the wrong reason.'"

*Sutherland v. Comm'r Soc. Sec.*, 785 F. App'x 921, 928 (3d Cir. 2019) (quoting *Morales*, 225

F.3d at 317); *see also Nazario*, 794 F. App'x at 209–10 ("We have also held that although the

government 'may properly accept some parts of the medical evidence and reject other parts,' the

government must 'provide some explanation for a rejection of probative evidence which would

suggest a contrary disposition.'") (quoting *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994));

*Morales*, 225 F.3d at 317 ("Where . . . the opinion of a treating physician conflicts with that of a

non-treating, non-examining physician, the ALJ may choose whom to credit[.]"); *Cotter*, 642

F.2d at 706–07 ("Since it is apparent that the ALJ cannot reject evidence for no reason or for the

wrong reason, . . . an explanation from the ALJ of the reason why probative evidence has been

rejected is required so that a reviewing court can determine whether the reasons for rejection

were improper.") (internal citation omitted).

As noted, the ALJ found that Plaintiff had the RFC to perform a limited range of

sedentary work:

> After careful consideration of the entire record, the undersigned finds that, through
> the date last insured, the claimant had the residual functional capacity to perform
> sedentary work as defined in 20 CFR 404.1567(a) except the claimant could
> occasionally lift or carry 10 pounds, frequently less than 10 pounds, stand and/or
> walk for a total of 2 hours for both in an 8 hour workday, sit for up to 6 hours in an
> 8 hour workday with normal breaks, occasionally climb ramps or stairs, but
> generally just a few steps, rarely full flights, and never climb ladders, ropes, or
> scaffolds. He could occasionally stoop, and never kneel, crouch, or crawl. The
> claimant could frequently handle or finger with the non-dominant left arm, and he
> had to avoid concentrated exposure to extreme heat and to pulmonary irritants, such
> as fumes, odors, dusts and gases. The claimant could not operate foot controls or
> balance on uneven surfaces. The claimant had to use a cane to ambulate to and from

19

the workstation. He could stand and/or walk in up to 15-minute increments at a time, after which he could sit for three minutes while remaining on task before resuming standing or walking. The claimant is able to apply common sense and understanding to remember and carry out detailed, but uninvolved instructions in the performance of simple, routine, and repetitive tasks.

R. 740. In making this determination, the ALJ detailed years of record evidence, including, *inter alia*, an October 2000 MRI of Plaintiff's brain that revealed findings consistent with the clinical diagnosis of multiple sclerosis ("MS"); an August 2002 MRI that revealed a significant increase in the size and number of MS plaques with a large dominant new plaque in the periventricular frontal lobe white matter without corresponding physical examination findings, although Plaintiff reported that he was experiencing slurred speech, dysphagia and left-sided numbness and left hemiparesis; a January 2003 physical examination by Diego Cadavid, M.D., during which Plaintiff reported that he had not experienced long-lasting improvement following his symptom flare-up in the summer of 2002, but which included physical findings of only mild peri-oral facial weakness, 5-/5+ strength in the left iliopsoas muscle, and a slowed performance of seven seconds on the 25-foot walk test; mental status findings of a depressed affect with some cognitive difficulty, but that Plaintiff remained alert and oriented; findings of normal fundus, corrected visual acuity of 20/25 in the left eye and 20/25-1 in the right eye, normal examination of the pupils, normal hearing, and normal ability to complete the nine-hole peg test with either hand; a contemporaneous MRI of the brain that revealed moderately extensive white matter disease, but a marked improvement in the appearance of the contrast enhancing plaque in the right frontal lobe; a March 2003 office visit during which Plaintiff reported left facial sensory symptoms and examination findings of mild left-sided facial weakness and mild left hemiparesis measuring 5-/5 in the left upper and lower extremities, but finding that Plaintiff was able to jump on either leg, walk heel to toe, and could complete the 25-foot walk test in six seconds,

20

representing improvement since January 2003; Plaintiff's April 2003 call to his provider's office at Holy Name Hospital, reporting that he had been feeling poorly and requesting a prescription for intravenous steroid; Plaintiff's May 2003 follow-up call, reporting improvement in his symptoms and requesting a taper of oral prednisone; Dr. Cadavid's June 2003 examination, during which Plaintiff reported recent weakness and shaking in his left arm but that his symptoms had already started improving with steroids, with examination findings of a flat and depressed affect but that Plaintiff was alert and oriented in four spheres, his uncorrected visual acuity measured 20/20-1 in the right eye and 20/40 in the left eye, and full extraocular movements with round, equal and reactive pupils, and that Plaintiff completed the 25-foot walk test in five seconds, and that, despite mild ataxia or tremor in the left upper extremity, Plaintiff had full strength in the bilateral upper and lower extremities with brisk reflexes, and a good tandem gait; Plaintiff's October 2003 examination by Dr. Picone, during which Plaintiff complained of slurred speech, numbness, panicky feelings, and right calf swelling, with physical findings that cranial nerves II-XII were within normal limits, that finger-to-nose and heel-knee-shin maneuvers were intact, but there were decreased fine finger movements and an inability to tandem walk, that Plaintiff had a mild abnormality with respect to sensation to vibration in the bilateral lower extremities, but normal sensation to vibration in the upper extremities, that he walked with a paretic yet unassisted gait. R. 741–43. The ALJ also explained why she included a limitation for a cane in the RFC:

> In his Function Report, the claimant indicated that he was first prescribed a cane after his initial diagnosis of multiple sclerosis, and that he used it when "out and around" (Exhibit 5E/7). Although treatment notes through the date last insured documented that the claimant presented for physical examinations without the use of an assistive device, findings such as 5-/5+ strength in the left iliopsoas on January 7, 2003, and an unassisted but paretic gait on October 30, 2003, would support finding a cane medically necessary (Exhibit 1F/11 and 28).

R. 743. The ALJ expressly acknowledged the relapsing and remitting nature of Plaintiff's MS

and considered his medication treatment and any side effects, as follows:

> Although the claimant's multiple sclerosis is relapsing and remitting in nature, and [Plaintiff's wife] testified on November 16, 2021, that medication has been ineffective in managing the claimant's symptoms and flare-ups, treatment notes through the date last insured are not entirely consistent with this allegation. For example, on May 1, 2003, the claimant reported feeling a bit better after completing a five-day course of intravenous steroids, and on June 3, 2003, he reported ongoing improvement (Exhibit 1F/21 and 23). At the hearing on July 13, 2021, the claimant's representative asked the medical expert about potential side effects from the claimant's prescribed medications, but treatment notes through the date last insured characterize the claimant's side effects as mild and/or temporary in nature. For example, on January 7, 2003, Dr. Cadavid noted that the claimant reported mild side effects with Avonex, and on June 3, 2003, Dr. Cadavid noted that the claimant had minor headaches when he started taking Betaseron, but they had since resolved (Exhibit 1F/11 and 23)[.]

*Id*. The ALJ went on to further explain the RFC determination as follows:

> The undersigned has limited the claimant's residual functional capacity to a reduced range of sedentary work in order to have accommodated the limiting effects of multiple sclerosis as documented by the objective evidence through the date last insured. Based on his examination of the record, Dr. Goldstein, a medical expert and neurologist, testified that the claimant would have been capable of performing work at the sedentary level of exertion through the date last insured. The undersigned further limited the claimant's postural activities, as well as his use of the left upper extremity, his operation of foot controls in light of physical examination findings showing some decreased strength in the left upper and lower extremities, as well as decreased sensation to vibration in the bilateral lower extremities (See Exhibit 1F/11 and 28 [R. 515, 532]). The undersigned also included the claimant's need for a cane for ambulation to and from the workstation in light of his statement in his Function Report that he was first prescribed one following his initial diagnosis, and findings on physical examinations showing that he had some decreased strength in the left lower extremity as well as a paretic gait on examination towards the end of the period at issue (Exhibit 1F/28 [R. 532]). As for limitations on exposure to extreme heat and pulmonary irritants, the undersigned included these to accommodate the claimant's reported flare-up triggers (Exhibit 1F/16 [R. 520]). Lastly, the undersigned limited the claimant to performing simple, routine, and repetitive tasks in light of his affective disorder, with findings on mental status examinations showing that he presented with some cognitive difficulty (Exhibit 1F/10 [R. 514]). Based on the foregoing, the undersigned finds the claimant has the above residual functional capacity assessment, which is supported by the objective evidence of record, the statements of the claimant and Ms. E[.], and the opinion evidence, as discussed above.

R. 749. In the view of this Court, this record contains substantial evidence to support the ALJ's

RFC determination. *See Zirnsak*, 777 F.3d at 615; *Rutherford*, 399 F.3d at 554.

Plaintiff, however, challenges the ALJ's consideration of several medical opinions when

crafting the RFC, which the Court addresses in turn.

### 1.   Dr. Picone's 2017 opinion

The ALJ considered Dr. Picone's 2017 opinion and assigned "little weight" to that

opinion, explaining as follows:

> On January 20, 2017, Dr. Picone drafted a letter in which she indicated that the
> *claimant had been disabled since 1997*. Dr. Picone further indicated that the
> claimant has had symptom relapses every six months, and that his ability to walk
> became more labored over the period of time from 1996 through 2003, and he
> started having slurred speech, difficulty swallowing, and left-sided numbness and
> weakness in 2003 as well (Exhibit 7F/1-2). *Although Dr. Picone is the claimant's
> treating doctor, the severity of her statements is inconsistent with contemporaneous
> treatment notes. Dr. Picone indicated that the claimant became disabled in 1997.*
> Aside from the fact that whether or not someone is disabled is an issue that is
> reserved to the Commissioner, *the undersigned notes that the claimant worked at
> the level of substantial gainful activity until November 1998 (*Exhibit 5D). When
> the claimant presented for physical examination on March 14, 2003, he did report
> that his left leg gave out on him. However, on physical examination, the claimant
> had only mild left-sided facial weakness and mild left hemiparesis measuring 5-/5
> in the left upper and lower extremities. Further, despite this mild hemiparesis, the
> claimant was able to hop on either leg, walk heel to toe, and complete the 25-foot
> walk test in six seconds, a time that Dr. Goldstein testified was within the range of
> normal (Exhibit 1F/15-18). Subsequently, on June 3, 2003, the claimant presented
> with ongoing improvement in his 25-foot walk test time, and although the claimant
> had mild ataxia or tremor in the left upper extremity, he did not have any limb
> weakness, and he exhibited a good tandem gait (Exhibit 1F/24). Lastly, on October
> 30, 2003, the claimant presented with a paretic gait, but he walked without the use
> of an assistive device, he had mildly decreased sensation to vibration in the bilateral
> lower extremities, and although he was unable to tandem walk, he could perform
> finger-to-nose and heel-knee-shin maneuvers (Exhibit 2F/27-29). Therefore,
> *although the evidence of record shows that the claimant had some deficits on
> examination during the period at issue, the findings did not rise to the level of
> disabling severity, as Dr. Picone concluded*. Consequently, the undersigned gives
> little weight to Dr. Picone's January 20, 2017, opinion.

R. 746 (emphasis added). The Court finds no error with the ALJ's evaluation of this opinion. *See* 20 C.F.R. § 404.1527(c)(3)–(4), (6); *Brunson v. Comm'r of Soc. Sec.*, 704 F. App'x 56, 59−60 (3d Cir. 2017) (finding that the ALJ "appropriately gave less weight" to medical opinions where, *inter alia*, the ALJ discounted a physician's opinion as "inconsistent with the record evidence"); *Phillips v. Barnhart*, 91 F. App'x 775, 780 (3d Cir. 2004) (concluding that the ALJ appropriately assigned limited weight to a treating physician's opinion where his "treatment notes, and in particular the treatment notes during the [relevant period], d[id] not support a finding that [plaintiff] was disabled at any time"); *cf. Louis v. Comm'r Soc. Sec.*, 808 F. App'x 114, 118 (3d Cir. 2020) ("Whether or not Louis can perform occupational duties is a legal determination reserved for the Commissioner.") (citing 20 C.F.R. § 404.1527(d)); *McGraw v. Comm'r Soc. Sec.*, 609 F. App'x 113, 115 (3d Cir. 2015) (finding that substantial evidence supported finding that the claimant had the RFC to perform work available in the national economy where, *inter alia*, the claimant "continued to work full time after the onset of his allegedly disabling condition"); *Smith v. Astrue*, 359 F. App'x 313, 316 (3d Cir. 2009) (concluding that, where the treating source's "medical opinion is contradicted by several pieces of evidence in the record and also contains internal inconsistencies, it is not entitled to the level of deference otherwise accorded to a treating physician's opinion"); *Gloria v. Berryhill*, 272 F. Supp. 3d 643, 654 (D. Del. 2017) (finding that the ALJ properly assigned no weight to a treating physician where, *inter alia*, the claimant, who suffered from MS, the ALJ pointed to medical evidence that contradicted the physician's opinion of the claimant's physical and mental limitations).

Plaintiff raises several challenges to the ALJ's consideration of Dr. Picone's 2017 opinion. *Plaintiff's Brief*, ECF No. 16, pp. 22–32; *Plaintiff's Reply Brief*, ECF No. 18, pp. 2–4. Plaintiff first argues that the ALJ assumed Plaintiff experienced "ongoing improvement" or

"sustained improvement" in his MS, contending that this flawed assumption was "a slightly more nuanced version of the prior ALJ's erroneous claims [in the 2017 decision]." *Plaintiff's Brief*, ECF No. 16, pp. 28–29; *Plaintiff's Reply Brief*, ECF No. 18, p. 2. In advancing this argument, Plaintiff specifically contends that the ALJ misstated the evidence and selectively cited to the evidence, excluding evidence that supports greater limitation of function. *Plaintiff's Brief*, ECF No. 16, pp. 29–31 (citations omitted); *Plaintiff's Reply Brief*, ECF No. 18, p. 2 (stating that the ALJ's assumption that Plaintiff had "sustained improvement" was "much like her predecessor[,]" *i.e.*, the ALJ who authored the 2017 decision). Plaintiff's arguments are not well taken. Contrary to Plaintiff's mischaracterization, the 2022 decision noted that Plaintiff "presented with ongoing improvement *in his 25-foot walk test time*" in June 2003, R. 746 (emphasis added), in which he completed that walk test in five seconds, as compared to completing the same walk test in January 2003 in seven seconds and in March 2003 in six seconds, R. 742. In other words, a fair reading of the 2022 decision reflects that the ALJ did not assume or conclude that Plaintiff's MS had improved *overall*; she simply considered how Plaintiff's walk test time had improved by June 2003 as compared to Plaintiff's walk test times earlier that year. R. 742, 746.

Moreover, the ALJ expressly acknowledged that Plaintiff had "some deficits on examination during the period at issue," including, *inter alia*, mild left-sided facial weakness, mild left hemiparesis measuring 5-/5 in the left upper and lower extremities, mild ataxia or tremor in the left upper extremity, paretic gait, inability to tandem walk, and mildly decreased sensation to vibration in the bilateral lower extremities. R. 746. However, the ALJ concluded that these "findings did not rise to the level of disabling severity, as Dr. Picone concluded," in light of other medical evidence in the record that reflected Plaintiff's abilities, *i.e.*, an ability in March 2003 to hop on either leg, walk heel to toe; no limb weakness in June 2003 with a good tandem

walk; and the ability to perform finger-to-nose and heel-knee-shin maneuvers in October 2003. R. 746.

Plaintiff nevertheless insists that the ALJ misstated and/or selectively cited to the record by omitting findings supportive of greater limitation. *Plaintiff's Brief*, ECF No. 16, pp. 29–31 (citations to the record omitted); *Plaintiff's Reply Brief*, ECF No. 18, p. 2. This Court again disagrees. As set forth above, the ALJ expressly considered evidence that reflected Plaintiff's deficits in 2003. R. 741–43, 746. Although the ALJ did not specifically repeat all this evidence in the paragraph discussing Dr. Picone's 2017 opinion, R. 746, she was not required to do so. *Cf. Serrano v. Kijakazi*, No. CV 20-3985, 2021 WL 4477137, at *3–4 (E.D. Pa. Sept. 30, 2021) ("In this case, the ALJ discussed and analyzed the evidence extensively before determining the persuasiveness of the medical opinions. . . . The ALJ was not required to repeat this information for the sake of elaborating on her findings of persuasiveness."). To the extent that Plaintiff relies on his subjective statements to bolster his argument, *Plaintiff's Brief*, ECF No. 16, pp. 29–31, the mere memorialization of a claimant's subjective complaints in a medical record will not serve to transform those complaints into objective findings or medical opinion. *Hatton v. Comm'r of Soc. Sec. Admin.*, 131 F. App'x 877, 879 (3d Cir. 2005) ("[A] medical source does not transform the claimant's subjective complaints into objective findings simply by recording them in his narrative report[.]") (summarizing *Craig v. Chater*, 76 F.3d 585, 590 n. 2 (4th Cir. 1996)); *Morris v. Barnhart*, 78 F. App'x 820, 824–25 (3d Cir. 2003) ("[T]he mere memorialization of a claimant's subjective statements in a medical report does not elevate those statements to a medical opinion.") (citations omitted); *Famularo v. Comm'r of Soc. Sec.*, No. CV 20-1655, 2021 WL 613832, at *7 (D.N.J. Feb. 17, 2021) ("[A] claimant's own subjective report about her symptoms[] does not become a medical opinion by virtue of being recorded in treatment notes.")

26

(citations omitted). Moreover—and as will be discussed in more detail later in this Opinion and Order—the ALJ properly discounted those subjective statements. In any event, the Court "will uphold the ALJ's decision even if there is contrary evidence that would justify the opposite conclusion, as long as the 'substantial evidence' standard is satisfied." *Johnson v. Comm'r of Soc. Sec.*, 497 F. App'x 199, 201 (3d Cir. 2012) (citing *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986)); *see also Hatton*, 131 F. App'x at 880 ("When 'presented with the not uncommon situation of conflicting medical evidence . . . [t]he trier of fact has the duty to resolve that conflict.'") (quoting *Richardson v. Perales*, 402 U.S. 389, 399 (1971)).

Although Plaintiff complains that the ALJ improperly minimized evidence that weighs in Plaintiff's favor and erred in presuming that "the presence of some negative findings negates documentation of positive findings," *Plaintiff's Brief*, ECF No. 16, p. 31; *Plaintiff's Reply Brief*, ECF No. 18, p. 2, this argument boils down to nothing more than a disagreement with the ALJ's decision in this regard, which the Court has already explained is supported by substantial evidence. *See Perkins v. Barnhart*, 79 F. App'x 512, 514–15 (3d Cir. 2003) ("Perkins's argument here amounts to no more than a disagreement with the ALJ's decision, which is soundly supported by substantial evidence."). The Court therefore declines Plaintiff's invitation to re-weigh the evidence or to impose his — or this Court's — own factual determination. *See Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011) ("Courts are not permitted to reweigh the evidence or impose their own factual determinations [under the substantial evidence standard]."); *Hatton*, 131 F. App'x at 880; *Zirnsak*, 777 F.3d at 611 (stating that a reviewing court "must not substitute [its] own judgment for that of the fact finder").

In short, a fair reading of the ALJ's decision as a whole and her consideration of Dr.

Picone's 2017 opinion in particular reflects that the ALJ appropriately considered the evidence

and her consideration in this regard enjoys substantial support in the record.

### 2. Dr. Picone's 2021 step three opinion

The ALJ also considered Dr. Picone's 2021 step three opinion and assigned "little

weight" to that opinion, explaining as follows:

> In a functional assessment dated June 24, 2021, Dr. Picone indicated that the claimant met the listings for multiple sclerosis and peripheral neuropathies as of November 1996 (Exhibit 23F). The issue of whether an individual is disabled is one that is reserved to the Commissioner. Aside from this issue being reserved to the Commissioner, the undersigned notes that the claimant continued to work at the level of substantial gainful activity through 1998, contradicting Dr. Picone's assertion that the claimant became disabled in 1996 (Exhibit 5D/2). Additionally, treatment notes through the period at issue show that he ambulated without the use of an assistive device, and he was able to perform heel-knee-shin and finger-to-nose maneuvers, and that he had no more than mild left-sided weakness (Exhibit 1F/11-12, 17, 24, and 28). As Dr. Goldstein testified at the hearing, these findings do not rise to the level of severity required to meet or medically equal a listing. Finally, it is unclear how Dr. Picone would have been able to opine in 2021 that the claimant's limitations met the listing for Multiple Sclerosis since 1996 when she began treating him in 2002 (Exhibit 23F/5). Therefore, the undersigned gives little weight to Dr. Picone's June 24, 2021, assessment.

R. 748. Substantial evidence supports the ALJ's consideration in this regard. *See* 20 C.F.R. §

404.1527(c)(3)–(4), (6); *Brunson*, 704 F. App'x at 59−60; *Phillips*, 91 F. App'x at 780; *cf. Louis*,

808 F. App'x at 118; *McGraw*, 609 F. App'x at 115; *Smith*, 359 F. App'x at 316; *Gloria v.*

*Berryhill*, 272 F. Supp. 3d 643, 654.

Plaintiff challenges the ALJ's consideration of Dr. Picone's 2021 step three opinion.

*Plaintiff's Brief*, ECF No. 16, pp. 22–32; *Plaintiff's Reply Brief*, ECF No. 18, pp. 2–4. To the

extent that Plaintiff raises the same arguments against the ALJ's evaluation of Dr. Picone's 2017

opinion, those arguments are unavailing for the reasons already discussed.[7] Moreover, the Court notes that Plaintiff, who bears the burden at step three, offers no analysis as to how he actually satisfied all the criteria necessary to meet or medically equal Listing 11.09, which addresses multiple sclerosis, or Listing 11.14, which addresses peripheral neuropathy. *See generally Plaintiff's Brief*, ECF No. 16; *Plaintiff's Reply Brief*, ECF No. 18; *cf. Atkins v. Comm'r Soc. Sec.*, No. 19-2031, 2020 WL 1970531, at *4 (3d Cir. Apr. 24, 2020) ("Lacking any direction from [the claimant] as to the specific [evidence] at issue, we will not scour the record to attempt to discern [the claimant's] position."). For all these reasons, the ALJ's consideration of Dr. Picone's 2021 step three opinion is supported by substantial evidence.

### 3.    Dr. Picone's 2021 RFC opinion and Mr. McHale's 2020 opinion

The ALJ also assigned "little weight" to Dr. Picone's 2021 RFC opinion and Mr. McHale's 2020 opinion, reasoning as follows:

> On March 11, 2020, the claimant presented for a functional capacity evaluation. Based on his performance, Terence McHale, PT concluded that the claimant was incapable of performing even sedentary work (Exhibit 21F/7). Dr. Picone endorsed PT McHale's conclusion, and indicated that these limitations applied throughout the claimant's lifetime (Exhibit 21F/2-6). PT McHale's conclusion regarding the claimant's inability to tolerate even sedentary work was based on an examination that took place more than 16 years after the date last insured. The undersigned is unable to agree with Dr. Picone that the limitations documented on an evaluation on March 11, 2020, applied even to the period prior to the date last insured because such a conclusion is inconsistent with the contemporaneous treatment notes. While physical examinations did reveal mild deficits in strength in the left upper and lower extremities, and mildly decreased sensation to vibration in the bilateral lower extremities, physical examinations otherwise showed that the claimant was able to ambulate without an assistive device, his performance on the 25-foot walk test improved with treatment, and he was able to perform finger-to-nose and heel-knee-shin maneuvers without difficulty (Exhibit 1F/11-12, 17, 24, and 28). Given his presentation on examinations prior to the date last insured, the undersigned gives little weight to the opinions of PT McHale and Dr. Picone.

---

[7] Plaintiff's challenges to Dr. Goldstein's testimony are addressed later in this decision.

R. 747–48. Substantial evidence supports the ALJ's consideration in this regard. *See* 20 C.F.R. § 404.1527(c)(3)–(4), (6); *Brunson*, 704 F. App'x at 59–60; *Phillips*, 91 F. App'x at 780; *cf. Louis*, 808 F. App'x at 118; *McGraw*, 609 F. App'x at 115; *Smith*, 359 F. App'x at 316; *Gloria v. Berryhill*, 272 F. Supp. 3d 643, 654.

Plaintiff challenges the ALJ's consideration of Dr. Picone's 2021 RFC opinion and Mr. McHale's 2020 opinion, raising the same arguments as he raised in challenging Dr. Picone's 2017 and 2021 step three opinions. *Plaintiff's Brief*, ECF No. 16, pp. 22–32; *Plaintiff's Reply Brief*, ECF No. 18, pp. 2–4. For the reasons previously discussed, those arguments are unavailing and the ALJ's consideration of Dr. Picone's 2021 RFC opinion and Mr. McHale's 2020 opinion enjoys substantial support in the record.

### 4.     Dr. Picone's 2021 letter opinion

The ALJ also assigned "little weight" to Dr. Picone's 2021 letter opinion:

In a letter dated June 25, 2021, Dr. Picone indicated that the claimant became disabled in 2002 and summarized a timeline of events from July 2002 through October 2003 (Exhibit 22F/2). With respect to her entry for July 2002, Dr. Picone indicated that the claimant developed slurred speech, dysphagia, left sided numbness, and left hemiparesis, from which he never recovered. Dr. Picone further indicated that in January 2003, the claimant's left side of the body was numb with left side facial weakness, urinary urgency and frequency, erectile dysfunction, and an unsteady gait. Dr. Picone's summary of the claimant's July 2002 symptoms appear to come from his report, and by the time he presented for examination on January 7, 2003, he exhibited only mild perio-oral facial weakness with 5-/5+ strength in the left iliopsoas and otherwise normal strength in the bilateral upper and lower extremities. The claimant completed the 25-foot walk test in seven seconds, but his time improved to five seconds by June 3, 2003 (Exhibit 1F/10-12 and 23-24). In her letter, Dr. Picone also cited progressive vision loss, but treatment notes show that the claimant's corrected visual acuity measured 20/25-1 in the right eye and 20/25 in the left on January 7, 2003. The claimant's uncorrected visual acuity measured 20/20-1 in the right eye and 20/40 in the left eye on June 3, 2003; there was no measurement of the claimant's corrected visual acuity to make a relevant comparison to prior examination findings (Exhibit 1F/22). Lastly, when the claimant presented for examination with Dr. Picone on October 30, 2003, treatment notes show that the claimant did present with a paretic gait, but he ambulated without the use of an assistive device, and he had only mildly decreased

sensation to vibration in the bilateral lower extremities (Exhibit 1F/28). In light of these considerations, the undersigned gives little weight to Dr. Picone's June 25, 2021 letter.

The undersigned has considered the opinions of treating physician, Ann Picone, M,D, pursuant to 20 CFR 404.1527 and declines to give Dr. Picone's opinions controlling weight, as the opinions are not well supported by the medical evidence. Although Dr Picone is a treating provider, with a lengthy treatment record since 2002, and specializes in the area of neurology, her opinions are not entirely consistent with the record for the reasons described in detail above in this decision. The claimant's report to Dr. Picone that he had been using a chainsaw to cut down trees is inconsistent with the severe limitations to which Dr. Picone has opined (Exhibit 15F/20 [R. 1836]).

R. 748–49. The ALJ's consideration in this regard is supported by substantial evidence. *See* 20 C.F.R. § 404.1527(c)(3)–(4), (6); *Brunson*, 704 F. App'x at 59–60; *Phillips*, 91 F. App'x at 780; *Samah v. Comm'r of Soc. Sec.*, No. CV 17-08592, 2018 WL 6178862, at *6 (D.N.J. Nov. 27, 2018) (finding that substantial evidence supported the ALJ's decision to discount a treating physician's opinion where, *inter alia*, the "opinion was not consistent with the Plaintiff's own testimony"); *cf. Louis*, 808 F. App'x at 118; *McGraw*, 609 F. App'x at 115; *Cunningham v. Comm'r of Soc. Sec.*, 507 F. App'x 111, 118 (3d Cir. 2012) ("[I]t is appropriate for an ALJ to consider the number and type of activities in which a claimant engages when assessing his or her residual functional capacity."); *Smith*, 359 F. App'x at 316.

To the extent that Plaintiff relies on the same arguments to challenge the ALJ's consideration of Dr. Picone's 2021 letter opinion as when challenging consideration of this physician's other opinions, *Plaintiff's Brief*, ECF No. 16, pp. 22–32; *Plaintiff's Reply Brief*, ECF No. 18, pp. 2–4, the Court has already explained why those arguments are unavailing. Plaintiff also contends that the ALJ erroneously evaluated his activities, specifically arguing the ALJ improperly "focused on one aspect of the record[— using a chainsaw to cut down trees —] as a basis to discard another." *Plaintiff's Brief*, ECF No. 16, p. 31; *Plaintiff's Reply Brief*, ECF No.

31

18, p. 2. This Court disagrees. As a preliminary matter, the ALJ did not err when considering

Plaintiff's activities. *See Brunson*, 704 F. App'x at 59−60 (finding that the ALJ "appropriately

gave less weight" to medical opinions where although one physician concluded the plaintiff "was

limited in his work abilities, his report lacked adequate support for this determination" and that

physician's "conclusion conflicted with both [the plaintiff's] self-reported daily activities and

[the physician's] own positive reports after [] surgery"); *cf. Cunningham*, 507 F. App'x at 118.[8]

While Plaintiff complains that the ALJ improperly "focused" on Plaintiff's use of a chain saw,

that evidence was but one factor that the ALJ considered when discounting Dr. Picone's

opinions, including the 2021 letter opinion. R. 746–49.

Plaintiff goes on to assert, relatedly, that the ALJ failed to consider the waxing and

waning nature of Plaintiff's MS. *Plaintiff's Brief*, ECF No. 16, pp. 31–32. However, as this Court

has previously detailed, the ALJ specifically discussed Plaintiff's deficits when weighing Dr.

Picone's opinions, including the 2021 letter opinion. R. 742–73, 746–49. Notably, the ALJ

expressly acknowledged the "relapsing and remitting" nature of Plaintiff's MS. R. 743–44.

Accordingly, for all these reasons, the ALJ's consideration of Dr. Picone's 2021 letter opinion is

supported by substantial evidence and will not serve as a basis for remand of this action.

### 5. Dr. Goldstein's opinion

The ALJ also considered the hearing testimony of Dr. Goldstein and assigned "great

weight" to that opinion, explaining as follows:

> As for the opinion evidence, Dr. Goldstein, a board-certified neurologist[,] testified
> that the evidence was sufficient to establish that the claimant had been diagnosed
> with multiple sclerosis prior to the date last insured. Dr. Goldstein testified that [he]
> was able to review evidence of abnormal MRI scans and treatment with

---

[8] The Court further addresses Plaintiff's part-time work activities when addressing Plaintiff's
subjective complaints.

medications, however he did not see many detailed physical examinations prior to the date last insured.

Dr. Goldstein further testified that based upon the records that he had available for review in the objective evidence through the date last insured, the claimant did not meet or medically equal the criteria of a listing, Dr. Goldstein testified that multiple sclerosis is a relapsing condition. Even if there is an acute attack, 75% of the time the neurological test deficit will go away after a relapse, and 25% of the time the individual will be left with some residuals which can build up over time as you get more tax [sic]. So, one would think that the further on in the course of the disease, the worse off the patient would be. Further, just because someone is receiving treatment with a disease modifying agent because of their diagnosis, does not mean that they are experiencing symptoms, or are having abnormal examination findings, but rather the treatment is being used to try to prevent any further attacks, and the person could be perfectly fine. Further, that IV steroids are used for patients with acute attacks of multiple sclerosis, so that the steroid treatment the claimant received for a few days in April and October 2003 means that the claimant probably experienced acute attacks at that time. In addition, even if you had an examination during an acute attack, that would not tell you what the person's condition would be six or 12 months later. You have to look a series of physical examinations over time to determine whether the deficits went away went away [sic] or not.

In response to their representative pointing out notes in the record at [sic] dated January 7, 2003, Dr. Goldstein stated that the incapacity status data on the left side of the page looked as if it was information reported by the claimant or medical assistant taking a history from the claimant (Exhibit 1F/10). Further, that the data filled in on the right side of the page was apparently filled out by the examining clinician. In addition, the clinical findings for that visit on pages 11-12, indicated vital signs were normal, his pupils were okay, he had mild facial weakness, normal limb strength except slight weakness in the left lower extremity, negative Romberg's, DTRs 3+ in the lower extremities, 2+ in the upper extremities. In addition, he had negative Hoffman sign and Babinski's sign, decreased hopping with left leg, nine-hole peg test normal bilaterally and 25-foot walk slightly decreased at seven seconds. Dr. Goldstein stated that a normal finding is usually doing a 25 foot walk in below 5 to 6 seconds. Dr. Goldstein stated that this suggests that there was some very slight weakness in the left lower extremity that was not there before. However, he stated that the claimant certainly would have had an effective gait if he was able to walk 25 feet in seven seconds.[9] (Exhibit 1F/10-12).

Dr. Goldstein noted that in March 2016, the claimant was noted to do a 25-foot walk in 7.48 seconds exam, which is only a very slight decrease in 13 years (Exhibit 5F/9).

---

[9] "When discussing the January 7, 2003, examination, Dr. Goldstein at one point referred to the claimant doing the 25 foot walk in seven minutes. However, he clearly meant seven seconds, as per his early testimony regarding this exhibit and as per the record (Exhibit 1F/10) [R. ]." R. 744.

33

Dr. Goldstein stated that the examination notes from March 2003 indicate a mild left hemiparesis in arm and leg, The claimant was able to jump on either leg, which examination tests balance. He was able to walk heel to toe, and his 25 feet walk test was six seconds. Although he still had some weakness on the left side, this was an improvement from and not as severe as his January 2003 examination clinical findings and a repeat MRI was improved (Exhibit 1F/17).

Dr. Goldstein stated that the examination notes from June 2003 indicate his 25 feet walk test was improved from seven seconds in January 2003 to five seconds today, with normal strength even in his left leg and mild ataxia in the left upper extremity, good tandem gait, and numb around his mouth area. He was noted to be clinically stable with an improved examination except for the left arm episode one week prior (Exhibit 1F/24).

Dr. Goldstein stated that the examination notes from October 2003 indicate his brainstem function was normal, coordination was okay, motor function was 5/5 in both the upper and lower extremities, there was mild abnormality in vibration in the lower extremities, which would indicate he would have a mild balance problem in walking, and he was able to stand unsupported and walk alone with a paretic gait (Exhibit 1F/28).

Dr. Goldstein stated that the examination notes from June 2004, which is six months after the date last insured, indicated lower extremity motor function strength was 4, upper extremity strength was five, tandem walking was performed with difficulty, he still had the mild difficulty with vibration, and his gait was normal but spastic at times. (Exhibit 1F/32).

Dr. Goldstein was able to discuss, on the record, every treatment note that pre-dated the date last insured. In going through the evidence in such a manner, he explained the rationale supporting his opinion with specific references to the record, as well as why the claimant would not have been more limited than Dr. Goldstein identified.

Dr. Goldstein noted that the objective findings were insufficient to meet or equal listing level severity. He stated that the objective exams were relatively normal, and that the improvement in the 25 feet walk test quantifies the degree of improvement. Dr. Goldstein also noted that the claimant reported that he had to go to the emergency room in December 2019, because he sustained a laceration when he had been using a chainsaw to cut down trees (Exhibit 15F/20).

Thereafter, Dr. Goldstein responded in detail to questions from the representative.

Dr. Goldstein opined that based upon the clinical examinations prior to the alleged onset date, the claimant would have been limited to a range of work at the sedentary level of exertion (Exhibit 1F/10, 17, 24, 28).

> In light of Dr. Goldstein's careful consideration of the evidence and his explanation
> for his opinion, the undersigned gives great weight to Dr. Goldstein's opinion.

R. 744–45. The Court finds no error with the ALJ's consideration in this regard. *See* 20 C.F.R. §
404.1527(c)(3)–(6).

Plaintiff, however, argues that the ALJ erred in assigning great weight to Dr. Goldstein's
opinion. *Plaintiff's Brief*, ECF No. 16, pp. 32–34; *Plaintiff's Reply Brief*, ECF No. 18, pp. 4–5.
Plaintiff contends that the ALJ failed to consider that Dr. Goldstein did not adequately prepare
for his testimony and that portions of Dr. Goldstein's testimony ultimately supported a disability
finding. *Id*. The Court is not persuaded that these issues require remand. As a preliminary matter,
as previously detailed, it is true that Dr. Goldstein mistakenly testified at the outset that there
were no physical examinations during the relevant period and, therefore, he initially concluded
that Plaintiff had no functional limitations. R. 802–08. However, once Dr. Goldstein was alerted
to evidence of physical examinations in the record during the relevant period, he testified that
Plaintiff would be limited to sedentary work and would be able to push and pull 10 pounds
frequently and 20 pounds occasionally in a seated position. R. 808–10. Accordingly, to the extent
that Dr. Goldstein's initial testimony reflects some level of lack of preparation, the Court cannot
say that that fact resulted in any harmful error where Dr. Goldstein was directed to, and
considered, the relevant medical evidence and offered an opinion based on that evidence. *See id*.;
*cf. Shinseki v. Sanders*, 556 U.S. 396, 409–10 (2009) ("[T]he burden of showing that an error is
harmful normally falls upon the party attacking the agency's determination. . . . [T]he party
seeking reversal normally must explain why the erroneous ruling caused harm.").

Plaintiff also insists that Dr. Goldstein's testimony that common side effects of Plaintiff's
medications are flu-like symptoms and that some people cannot tolerate the drugs used by

Plaintiff support a finding of disability. *Plaintiff's Brief*, ECF No. 16, p. 33 (citing R. 818–19). Plaintiff also notes that his medications were changed three times in 2002/2003 and that this evidence led Dr. Goldstein to testify that Plaintiff must have been complaining of medication side effects at that time. *Id*. (citing R. 819). According to Plaintiff, "[t]hese acknowledged side effects impacted Mr. E[.]'s ability to function and would have interfered with any attempt by Mr. E[.] to sustain full-time work. Yet the ALJ failed to engage in any meaningful evaluation of the issue." *Id*. Plaintiff's argument is not well taken. The exchange between Dr. Goldstein and Plaintiff's attorney regarding side effects is as follows:

> ATTY: No, the motor vehicle accident has nothing to do with 2003. I wanted to know about the side effects of the medications. The records show they keep switching his meds to like avanax (PHONETIC), copaxum, and whatever that is.

> ALJ: I didn't hear what you said. What did you say, doctor?

> ME: Betaseron (PHONETIC) was the name.

> ALJ: Oh, okay. Fine.

> ATTY: Is it reasonable to say he might have side effects?

> ME: Well, they do. Any medication has side effects, and the common side effects of these medications are flu-like symptoms.

> ATTY: So how often do you have to take these meds? Is it like once a month, once a day, once a week?

> ME: Well, some of them are once a day. Some of them are once a week. One is every other day.

> ATTY: And the flu-like symptoms are constant, or do they just last a couple days each time you take it?

> ME: In my experience, the ones that -- some people just can't tolerate it. They do get it like that. Most people might the first couple of times get more of a reaction and then kind of get used to it and then it doesn't happen anymore.

> ATTY: But with switching around, there could be days where they're not going to feel well from the medication. Is that reasonable?

> ME: Well, as I say, most people, it usually happens in the very beginning, the first week or two, and then they get used to it. The people that don't get used to it, they switch to something else. You can't function if you're going to have that all the time, so they switch to a different medicine.
>
> ATTY: It looks like in 2002, 2003, just this little period of time they're looking at, he was switching around meds; is that correct?
>
> ME: Yes, they switched, I think three times.
>
> ATTY: Okay. So he must have been having side effects.
>
> ME: Yes, he was complaining of side effects, and that's why they did that.

R. 818–19. Although it is true that Dr. Goldstein testified that Plaintiff's medication was changed because he complained of side effects, the Court cannot conclude that this testimony establishes that Plaintiff was disabled. Plaintiff engages in mere speculation when he argues that his acknowledged side effects "would have interfered with any attempt" for him to sustain full-time work; he offers no explanation or description of how these side effects actually limited him. *Plaintiff's Brief*, ECF No. 16, p. 33. Moreover, the ALJ actually considered that Plaintiff's medications were changed during the relevant period, R. 742–43, and expressly discussed Plaintiff's side effects in the context of Dr. Goldstein's testimony:

> At the hearing on July 13, 2021, the claimant's representative asked the medical expert about potential side effects from the claimant's prescribed medications, but treatment notes through the date last insured characterize the claimant's side effects as mild and/or temporary in nature. For example, on January 7, 2003, Dr. Cadavid noted that the claimant reported mild side effects with Avonex, and on June 3, 2003, Dr. Cadavid noted that the claimant had minor headaches when he started taking Betaseron, but they had since resolved (Exhibit 1F/11 and 23)[.]

R. 743. Thus, a fair reading of Dr. Goldstein's testimony and of the ALJ's 2022 decision as a whole does not persuade this Court that Dr. Goldstein's opinion supports a finding of disability.

Finally, Plaintiff goes on to argue that the ALJ improperly discounted every medical opinion from sources who actually examined or treated Plaintiff and, like the ALJ's 2017

decision, the 2022 decision was improperly based on only the ALJ's interpretation of the record. *Plaintiff's Brief*, ECF No. 16, pp. 33–34 (citing R. 860). This Court disagrees. The Court has already concluded that the ALJ properly discounted Dr. Picone's opinions as well as Mr. McHale's 2020 evaluation. To the extent that Plaintiff suggests that an ALJ must support every RFC limitation with a matching medical opinion, Plaintiff is mistaken. As previously discussed, it is the ALJ who is charged with determining the claimant's RFC. 20 C.F.R. § 404.1527(e), 404.1546(c); *see also Chandler*, 667 F.3d at 361 ("The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations.") (citations omitted). Accordingly, "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006); *see also Mays v. Barnhart*, 78 F. App'x 808, 813 (3d Cir. 2003) ("Primarily, the ALJ is responsible for making a residual functional capacity determination based on the medical evidence, and he is not required to seek a separate expert medical opinion."). Notably, "the ALJ is not precluded from reaching RFC determinations without outside medical expert review of each fact incorporated into the decision." *Chandler*, 667 F.3d at 362.

In short, for all these reasons, the Court concludes that the ALJ's findings regarding Plaintiff's RFC are consistent with the record evidence and enjoy substantial support in the record, as does her consideration of the opinions of Dr. Picone, Dr. Goldstein, and Mr. McHale.

## B.   Subjective Complaints

Plaintiff also challenges the ALJ's consideration of his subjective complaints. *Plaintiff's Brief*, ECF No. 16, pp. 34–37; *Plaintiff's Reply Brief*, ECF No. 18, pp. 5–7. His challenge is not well taken.

"Subjective allegations of pain or other symptoms cannot alone establish a disability."

*Miller v. Comm'r of Soc. Sec.*, 719 F. App'x 130, 134 (3d Cir. 2017) (citing 20 C.F.R. §

416.929(a)).  Instead, objective medical evidence must corroborate a claimant's subjective

complaints. *Prokopick v. Comm'r of Soc. Sec.*, 272 F. App'x 196, 199 (3d Cir. 2008) (citing 20

C.F.R. § 404.1529(a)).  Specifically, an ALJ must follow a two-step process in evaluating a

claimant's subjective complaints. SSR 16-3p, 2016 WL 1119029 (March 16, 2016). First, the

ALJ "must consider whether there is an underlying medically determinable physical or mental

impairment(s) that could reasonably be expected to produce an individual's symptoms, such as

pain." *Id*. "Second, once an underlying physical or mental impairment(s) that could reasonably

be expected to produce an individual's symptoms is established, [the ALJ] evaluate[s] the

intensity and persistence of those symptoms to determine the extent to which the symptoms limit

an individual's ability to perform work-related activities[.]" *Id*.; *see also Hartranft v. Apfel*, 181

F.3d 358, 362 (3d Cir. 1999) ("[Evaluation of the intensity and persistence of the pain or

symptom and the extent to which it affects the ability to work] obviously requires the ALJ to

determine the extent to which a claimant is accurately stating the degree of pain or the extent to

which he or she is disabled by it.") (citing 20 C.F.R. § 404.1529(c)). In conducting this

evaluation, an ALJ must consider the objective medical evidence as well as other evidence

relevant to a claimant's subjective symptoms. 20 C.F.R. § 404.1529(c)(3) (listing the following

factors to consider: daily activities; the location, duration, frequency, and intensity of pain or

other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side

effects of any medication you take or have taken to alleviate pain or other symptoms; treatment,

other than medication, currently received or have received for relief of pain or other symptoms;

any measures currently used or have used to relieve pain or other symptoms; and other factors

concerning your functional limitations and restrictions due to pain or other symptoms). Finally, an "ALJ has wide discretion to weigh the claimant's subjective complaints, *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983), and may discount them where they are unsupported by other relevant objective evidence." *Miller*, 719 F. App'x at 134 (citing 20 C.F.R. § 416.929(c)); *see also Izzo v. Comm'r of Soc. Sec.,* 186 F. App'x 280, 286 (3d Cir. 2006) ("[A] reviewing court typically defers to an ALJ's credibility determination so long as there is a sufficient basis for the ALJ's decision to discredit a witness.").

Here, the ALJ followed this two-step evaluation process. The ALJ specifically considered Plaintiff's subjective complaints. R. 741–49. The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause symptoms, but that Plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." R. 741. As previously discussed, the ALJ detailed years of medical evidence and record testimony to support her findings, including, *inter alia*, normal or mild physical examination findings. R. 741–49. The ALJ also explained how Plaintiff's subjective complaints were inconsistent with his activities, as follows:

> Further, there are inconsistencies between the claimant's allegations [and] his work activity. The claimant indicated in his Function Report that he experienced difficulty thinking, remembering, and talking well, as well as difficulty understanding things, following instructions, completing tasks, and following instructions (Exhibit 5E/5-6). The undersigned further notes that on mental status examination on January 7, 2003, the claimant exhibited a depressed affect with some cognitive difficulty (Exhibit 1F/10). Nevertheless, in a letter dated March 11, 2002, addressed to Dr. Cadavid, the claimant indicated that his last symptom exacerbation occurred in the context of a prolonged period of warm weather with temperatures at or near 100 degrees Fahrenheit, and his activities related to maintaining five apartments that he owned (Exhibit 1F/16). Elsewhere, a treatment from Dr. Cadavid dated June 3, 2003, indicates that the claimant was working off and on managing rental properties, and on October 30, 2003, Dr. Picone noted that the claimant was employed part-time (Exhibit 1F/22 and 27). Although the

40

> claimant's work activity may not have risen to the level of substantial gainful activity, and his statements would reasonably support a limitation restricting his exposure to conditions involving exposure to extreme heat, the fact that he was able to manage five rental properties, even on an intermittent basis, demonstrates that he had a greater cognitive ability than alleged.

R. 743. In the view of this Court, this record provides substantial support for the ALJ's decision to discount Plaintiff's subjective statements as inconsistent with the record evidence. *Van Horn*, 717 F.2d at 873; *Miller*, 719 F. App'x at 134; *Izzo*, 186 F. App'x at 286.

Plaintiff, however, challenges the ALJ's consideration in this regard, arguing that the ALJ improperly focused on evidence that did not show "sustained improvement" in Plaintiff's MS as the ALJ represented. *Plaintiff's Brief*, ECF No. 16, pp. 34–36. However, for the reasons already explained, this argument is unavailing.

Similarly unavailing is Plaintiff's argument that the ALJ did not consider the relevant regulatory factors. *Plaintiff's Brief*, ECF No. 16, pp. 35–36. As detailed above, the ALJ considered Plaintiff's activities, including managing rental properties part-time, R. 741, 743, 749; Plaintiff's complaints of pain, symptoms, and limitations, R. 742–43, 749; precipitating and aggravating factors, including exposure to extreme heat and pulmonary irritants, R. 749; Plaintiff's medication, dosage, effectiveness, and side effects, R. 742–43; and treatment other than medication that Plaintiff has received, including, *inter alia*, a prescription for a cane, R. 743;[10] *see also* 20 C.F.R. § 404.1529(c)(3)(i)–(v). In any event, even if the ALJ did not discuss every one of the regulatory factors, that failure does not require remand where substantial

---

[10] In this respect, Plaintiff's reliance on *Frankowski v. Berryhill*, No. 2:16-cv-8846, 2018 U.S. Dist. LEXIS 138081 (D.N.J. Aug. 14, 2018) is unavailing. (The Court notes that Plaintiff represented that he attached a copy of this decision from the Court's docket to his brief but no copy was attached and the Court is unable to find a Westlaw citation to this case.) *See Plaintiff's Brief*, ECF No. 16, pp. 35–36 (citing *Frankowski* for the proposition that the ALJ "ignored most of 'the other factors including in § 416.929(c)(3),' and failed to cite evidence that contradicted Mr. E[.]'s allegations of disabling symptoms").

41

evidence otherwise supports the ALJ's consideration of Plaintiff's subjective complaints. *See Lewis v. Comm'r of Soc. Sec.*, No. CV 15-1587, 2016 WL 4718215, at *7 (D.N.J. Sept. 9, 2016) ("The fact that the ALJ did not discuss all of the § 404.1529 factors does not warrant remand, given that his credibility determination was supported by substantial evidence."); *Mason v. Colvin*, No. 15-1861, 2015 WL 6739108, at *6 (D.N.J. Nov. 3, 2015) ("The list [of factors contained in 20 C.F.R. § 404.1529(c)] is not comprehensive, nor is it mandatory for ALJs to go through each factor on the list in their opinions.") (citing 20 C.F.R. § 404.1529(c)(3)); *Ladd v. Astrue*, No. CIV.A. 12-4553, 2014 WL 2011638, at *1 n.2 (E.D. Pa. May 16, 2014) ("However, neither this policy statement [in SSR 96-7p], nor § 404.1529(c)(3) (the governing regulation), mandates a specific finding as to each of the seven factors listed in § 404.1529(c)(3)(i)–(vi). The regulatory framework provides instead that an ALJ must consider 'objective medical evidence,' as well as the claimant's 'own statements' and 'other relevant evidence in the case record.'") (citing SSR 96–7p).

Plaintiff goes on to challenge the ALJ's consideration of Plaintiff's part-time work in managing rental properties, arguing that "such activity is not inherently inconsistent with an allegation of mental difficulties" and that the ALJ conceded that evidence from the relevant period reflected cognitive dysfunction. *Plaintiff's Brief*, ECF No. 16, pp. 36–37. Plaintiff's argument is not well taken. As an initial matter, the ALJ did not err in considering Plaintiff's ability to work part-time when assessing his subjective complaints. 20 C.F.R. §§ 404.1571; *Petravich v. Colvin*, No. CV 14-1602, 2016 WL 1117610, at *3 (W.D. Pa. Mar. 21, 2016) ("Although plaintiff alleges that the ALJ improperly focused on the part-time work plaintiff performed after her alleged onset date, the ALJ did not err in considering that part-time work as a factor in assessing plaintiff's credibility as to her allegations of debilitating limitations."); *cf.*

42

*Gloria*, 272 F. Supp. 3d at 655–56 (finding that the ALJ properly considered the daily activities of a claimant who suffered from MS as a factor in assessing credibility). Moreover, as set forth above, Plaintiff's ability to work part-time was but one of many facts that the ALJ took into account when assessing Plaintiff's subjective complaints. R. 741–49. While the ALJ noted some cognitive dysfunction during the relevant period, the ALJ also considered that Plaintiff was generally alert and oriented during his examinations. R. 742–43, 747, 749. The ALJ explained how she accommodated this cognitive difficulty by limiting Plaintiff to simple, routine, and repetitive tasks. R. 749. To the extent that Plaintiff insists that the ALJ erred in considering his part-time work or cognitive dysfunction, his argument boils down to nothing more than a disagreement with the ALJ's decision, which the Court has already explained is supported by substantial evidence. *See Perkins*, 79 F. App'x at 514–15; *cf. Johnson*, 497 F. App'x at 201.

For all these reasons, the Court concludes that the ALJ sufficiently explained her reasoning in assessing Plaintiff's subjective complaints, and the ALJ's findings in this regard are supported by substantial evidence in the record; her findings and conclusions in this regard are therefore entitled to this Court's deference. *See* SSR 16-3p; *Miller*, 719 F. App'x at 134; *cf. Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x. 761, 765 (3d Cir. 2009) ("Credibility determinations as to a claimant's testimony regarding pain and other subjective complaints are for the ALJ to make.") (citing *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983)); *Davis v. Comm'r Soc. Sec.*, 105 F. App'x 319, 322 (3d Cir. 2004) (finding that the ALJ sufficiently evaluated the plaintiff's testimony where "the ALJ devoted two pages to a discussion of claimant's subjective complaints and cited Claimant's daily activities and objective medical reports"). Accordingly, the ALJ's assessment of Plaintiff's subjective complaints will not serve as a basis for remand of this action. *Id.*

### C.    Step Five

Finally, Plaintiff challenges the ALJ's step five determination, arguing that the Commissioner failed to carry his burden of establishing that other work existed that Plaintiff could perform. *Plaintiff's Brief*, ECF No. 16, pp. 37–39; *Plaintiff's Reply Brief*, ECF No. 18, pp. 7–10.

At step five, an ALJ must decide whether the claimant, considering his RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy. 20 C.F.R. § 404.1520(g). Unlike in the first four steps of the sequential evaluation, it is the Commissioner who bears the burden of proof at step five. *Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 201 (3d Cir. 2019); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 205 (3d Cir. 2008) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 551 (3d Cir. 2005)). "'Advisory testimony from a vocational expert is often sought by the ALJ for that purpose [of determining whether other jobs exist in significant numbers in the national economy that the claimant could perform] . . . and factors to be considered include medical impairments, age, education, work experience and RFC.'" *Id*. at 205–06 (quoting *Rutherford*, 399 F.3d at 551). "Testimony of vocational experts in disability determination proceedings typically includes, and often centers upon, one or more hypothetical questions posed by the ALJ to the vocational expert." *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984). "Usually, the ALJ will ask whether a hypothetical claimant with the same physical and mental impairments as the claimant can perform certain jobs that exist in the national economy." *Zirnsak*, 777 F.3d at 614 (citing *Podedworny*, 745 F.2d at 218). "While 'the ALJ must accurately convey to the vocational expert all of a claimant's credibly established limitations,' . . . '[w]e do not require an ALJ to submit to the vocational expert every impairment alleged by a claimant.'" *Smith v. Comm'r of Soc. Sec.*,

631 F.3d 632, 634 (3d Cir. 2010) (quoting *Rutherford*, 399 F.3d at 554). "[T]o accurately portray a claimant's impairments, the ALJ must include all 'credibly established limitations' in the hypothetical. *Zirnsak*, 777 F.3d at 614 (citing *Rutherford*, 399 F.3d at 554). Credibly established limitations are limitations "that are medically supported and otherwise uncontroverted in the record." *Rutherford*, 399 F.3d at 554. "Limitations that are medically supported but are also contradicted by other evidence in the record may or may not be found credible—the ALJ can choose to credit portions of the existing evidence but cannot reject evidence for no reason or for the wrong reason." *Id.* (citations and internal quotation marks omitted). A "vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the [ALJ's hypothetical] question accurately portrays the claimant's individual physical and mental" limitations. *Podedworny*, 745 F.2d at 218. Stated differently, "[a] hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence." *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987).

In the case presently before the Court, the hypothetical question posed by the ALJ to the vocational expert assumed a claimant with Plaintiff's vocational profile and the RFC found by the ALJ. R. 740, 778–79. The vocational expert responded that the jobs of call-out operator, document preparer, stuffer, and ticket counter could be performed by such an individual. R. 779–82. For the reasons discussed earlier in this decision, this hypothetical sufficiently captured Plaintiff's credibly established limitations and therefore supported the ALJ's determination at step five. *See Rutherford*, 399 F.3d at 554; *Podedworny*, 745 F.2d at 218. To the extent that Plaintiff's criticism of the hypothetical questions is that all his alleged impairments were not

addressed, this criticism boils down to an attack on the RFC determination itself, *see Rutherford*, 399 F.3d at 554 n.8, which this Court has already rejected for the reasons previously discussed.

In short, the Court finds that the Commissioner has carried his burden at step five of the sequential evaluation and concludes that substantial evidence supports the ALJ's determination in this regard.

## VI.    CONCLUSION

For these reasons, the Court **AFFIRMS** the Commissioner's decision.

The Court will issue a separate Order issuing final judgment pursuant to Sentence 4 of 42 U.S.C. § 405(g).

**IT IS SO ORDERED.**


Date:  April 9, 2024                          *s/Norah McCann King*
                                              NORAH McCANN KING
                                              UNITED STATES MAGISTRATE JUDGE